IN THE DISTRICT COURT OF THE VIRGIN ISLANDS

DIVISION OF ST. THOMAS & ST. JOHN

* * *

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff<br>V.<br><br>SIMON PETERS,<br>Defendant. | ) | NO. 24-cr-5 |

## SENTENCING MEMORANDUM

The guideline provisions for the threats offense in this case are grossly disproportionate to the seriousness of Simon Peters' acts in this matter. Simply put, the recommended punishment does not fit the crime. As such, Simon Peters seeks a variance in this case and respectfully requests that this Court sentence him to a period of probation or to time served with a period of supervised release.

### I. Introduction

Simon Peters stands before this Court for sentencing on one count of influencing a federal official by threat. His actions in this case amount to a disgruntled, powerless United States Postal Service ("USPS") customer expressing his frustrations regarding the delay of the delivery of his package on a call. Simon acknowledges that in unleashing his frustration, he made threatening statements. He accepted responsibility for his actions and pled guilty. However, there was never an intent to carry out the threat. The only intent was to convey from over 3000 miles away how strongly his desire was for his package to be delivered. The distance from which he made the calls, coupled with the lack of intent to carry out the threat, support our request for a variance.

Simon was arrested on February 14, 2024, in Valley Center, California. He was presented in the District Court for the Southern District of California. The government moved for his detention and a magistrate judge granted the government's motion. As such, Mr. Peters was transported by the United States Marshal Service ("USMS") from San Diego, California to St. Thomas, U.S. Virgin Islands. His transportation to St. Thomas was interrupted by various placements at detention facilities across the country. He was initially held in San Diego, then moved to Seattle, Washington, then to North Dakota. From North Dakota he was moved to Oklahoma, then Miami, and then Puerto Rico. He appeared in court in St. Thomas on April 12, 2024, two months after his original detention. The government renewed its request for detention at his initial appearance, but Simon was released on home incarceration. At the time of sentencing, Simon will have been in home incarceration for over a year with no violations. Given the exaggerated nature of the guideline provisions when applied to Simon's actions, the two months he spent in the custody of the USMS, and the year he spent on home incarceration, no additional prison time is warranted.

## II. The Early Years

Simon Peters was born in Port Fortin, Trinidad to Deborah Eddy and Angas Agist, who were not married, in 1982. Simon describes his father as a rolling stone – he traveled a lot and had children with a number of women residing both in and outside of Trinidad. Simon knows some of his paternal siblings, but there are also others he has never met. As a young child, Simon lived in a home with his mother, but he considers himself to have been raised by Clerina Joseph. Ms. Joseph lived in the same neighborhood as Simon and cared for all the children in the neighborhood, particularly when their parents were at work. Simon's mom had a chicken farm in Trinidad and sold chickens and baked goods. His father worked as a sailor and a contractor.

Tragically, young Simon's father was murdered when Simon was just four years old. Simon has fond memories of his father. Despite his father having many children by many women, he still

made time for all of his kids and supported them financially. Simon recalls his father picking him up in his fancy car and taking him on long drives. To this day, Simon wonders what his life would have been like if his father had not been murdered.

With the money his father earned as a contractor, he was able to send some of his own siblings to college. Simon has paternal aunts and uncles residing stateside who benefitted from his father's hard work. However, due to his father' death, Simon's familial bond with those paternal aunts and uncles was broken and he is not in contact with them. Simon believes if his father had not been killed, Simon's life would have gone in a different direction – he may never have settled in the Virgin Islands and he may never have been involved with the criminal justice system.

The neighborhood Simon grew up in Trinidad was close-knit and crime-free. His maternal grandmother lived up the street from his home. His maternal grandfather, however, lived in St. Thomas, USVI. From his earnings in St. Thomas, his grandfather would send money to Trinidad for his mother. After young Simon's father's death, his mother no longer wanted to remain in Trinidad and began making plans to join her father in St. Thomas. So, in 1989, young Simon and his mother departed Trinidad and settled in St. Thomas with his grandfather in Hospital Ground. Young Simon was 6 years old at the time.

After getting settled, young Simon's mother obtained a job as a school custodian. About a year later, she was able to afford her own home and she and Simon moved out of his grandfather's home. Their new home was also in Hospital Ground. She met Calvin Eddy while living in Hospital Ground. Mr. Eddy was a jack of all trades; he was skilled in plumbing, masonry, and carpentry. Simon's mother and Mr. Eddy married, and Mr. Eddy moved in with young Simon and his mother. His mother and Mr. Eddy would go on to have three children together – Melvina, Diane, and Calvin Jr. Simon's siblings are substantially younger than him. As such, Simon had moved out of the house and off island before they completed elementary school.

Simon spent his earliest school years in Trinidad. Once he moved to St. Thomas, he attended J. Antonio Jarvis Elementary School and Addelita Cancryn School for junior high. Although he liked the subjects of math, English, and geography, young Simon was never very interested in school. He spent the school year waiting for the summer when he would return to Trinidad. In Trinidad, he resided primarily with his maternal grandmother, but bounced around his cousins' and friend's homes. By spending time with his elders, he learned how to knit; young Simon would make hats, socks, and tops.

Simon's mother worked as a custodian for several years before becoming a paraprofessional. When Simon was in school, she worked long hours and Simon would return home before her. He was tasked with caring for his younger siblings until his parents came home. Once one of them arrived, Simon was allowed to go out and play. He enjoyed playing baseball and basketball and his mother enrolled him in Boy Scouts of America. Through his participation in Boy Scouts, he was able to travel with them to a number of islands. His mother was, and still is, very religious. Young Simon attended church on Saturdays and Sundays.

Young Simon never saw college in his future. He had an entrepreneurial spirit – he wanted to be like his biological father. After completing the eighth grade, young Simon had had enough of school. He believed it was time he become a man. When he returned to St. Thomas after spending the summer after his eighth-grade school year in Trinidad, he started working with his step-father. Young Simon did not work full-time; he worked when he needed money.

Young Simon learned a variety of trades working with his stepfather. When he was not working, he hung out with his friends "round de field". By this time, his younger siblings were attending the school his mother worked at, so young Simon no longer had to care for them in the afternoons. At age 14, he joined some of his friends in their observation of the Rastafarian religion. At 15 years old he began smoking marijuana.

## III. Early Adulthood

In the early 2000s, after an introduction to the criminal justice system, Simon decided to relocate to the mainland. He felt that if he remained on island, he would end up dead. That was the unfortunate fate of many of his friends from "round de field". Reflecting on his youth, Simon knows he made the right decision as the majority of his friends from "round de field" are now dead.

Simon decided to relocate to New York – he had friends living there and his maternal grandfather had also relocated to New York. From New York, Simon moved to Baltimore, Maryland. The transition to Maryland was once again eased by the fact that he had friends already residing there. While living in Baltimore, he took frequent trips to Georgia.

Life in the continental United States was a rude awakening for Simon. Stateside, he was confronted with both overt and covert racism that shocked his system. Simon had never been called the "N word" prior to his relocation. The profiling of black men by the police and the mistreatment of black men by the criminal justice system soured his view of the country he had now become a citizen of. Simon initially thought this racist treatment was limited to the north, so he moved to the south. To his dismay, he found similar treatment everywhere he lived.

Continuously looking up to his deceased father, Simon did not stay anywhere long. Like a rolling stone, he moved around a lot. From Georgia he moved to Arizona. From Arizona, he moved to California. He chose cities he lived in based on the people he knew living there.

## IV. The Settlement in California

In 2008, Simon moved to San Diego, California. He resided in southern California from 2008 until his arrest in this case. Simon became the father to a baby girl in 2013. Her birth kept him rooted to southern California – an expensive place to live. Due to the exorbitant cost of living, Simon found

himself unhoused. Simon's living situation is sadly not uncommon in California as California is home to 24% of the nation's unhoused population.[1]

Forever the entrepreneur, in California, Simon worked as an independent buyer and seller of merchandise. He would buy household items at a discount rate here in the United States and then sell them to purchasers on various Caribbean islands, including Trinidad. As a second source of income, Simon would do landscaping and clean houses through word of mouth. When he had difficulty making ends meet, his mother would help him out.

Prior to his arrest in this case, 2008 was the last time Simon was in St. Thomas. He returned to island for three days to bury his maternal grandfather. For Simon, the Virgin Islands is not his home. Having lived in various states, he does not consider anywhere in the continental United States to be his home. His home is Trinidad – the place where he was born. So, while returning to the Virgin Islands for this case may be seen by others as a homecoming, it has not felt like that to Simon.

**V. Collateral Consequences**

Living here in St. Thomas has separated Simon from his 11-yeard-old daughter. His daughter was born in 2013. Simon has a close relationship with his daughter and, when living in California, he contributed financially to her upbringing. His daughter misses her father and is upset with him for leaving her. Simon misses her too and had promised her he would always be there for her. Simon feels awful that he broke his promise. His daughter suffers from a severe case of asthma that could result in her hospitalization. The possibility that Simon would be unable to sit at her hospital bed has haunted him throughout this year of home incarceration.

Simon has suffered additional collateral consequences due to his actions in this case. At the time he was arrested, a petition to terminate his sex offender registration was pending. His next court

[1] Cremin, Sean, *Homelessness Hits Record High in California, Jumps Dramatically in Rest of US*, Public Policy Institute of California (Mar. 25, 2025) available online at https://www.ppic.org/blog/homelessness-hits-record-high-in-california-jumps-dramatically-in-rest-of-us/

date on that petition was scheduled for July 15, 2024 – just five months after his arrest. As part of the basis for his request to be removed, Simon cited that there were no pending charges against him. However, at the time of his hearing on July 15, 2024, this instant case was pending. In denying his petition the court referenced his extradition to the Virgin Islands and this pending matter.

Simon had been on the registry for over 10 years at the time he petitioned to be removed. A review of the petition reveals that he must have neither a pending case nor be on court supervision in order to request to be removed from the registry. As such, he will not be able to re-petition the court to be removed from the registry for his misdemeanor conviction until his sentence in this case has concluded.

Simon left St. Thomas around 2001 and has made every effort to be his own man ever since. As a 43-year-old man who has been restricted to his parents' home and unable to make his own income, he feels like a burden. Simon never intended to live under his parents' roof again and regrets the strain his presence has put on the household.

As an unhoused individual, Simon kept his retail items in storage, along with some of his personal property. Since his arrest, he has been unable to earn any income and thus has been unable to pay his storage fees. As a result, he lost all his inventory. Simon is currently in danger of losing his car. Losing his car means losing his life because all his treasured belongings – including his clothes and documents – were stored in his car.

Simon suffers from asthma and at times has had to be transported to a hospital to address it. He uses an albuterol pump frequently and always carries it an effort to avoid an emergency. He is also semi-deaf in one ear. His hearing impairment was discovered when he was approximately three years old. As a child he had a hearing device implanted in his ear. But when cleaning his ear with a clothespin a decade later, he accidentally pulled it out. Simon has prescribed hearing aids, but they were not in his possession when he was arrested so his hearing aids remain in California.

In California, Simon was a daily marijuana user. California legalized marijuana for medical use in 1996 and for recreational use in 2016. Marijuana usage was part of Simon's religious practice. Since his arrest, he has been unable to partake in that aspect of his religion. He also has a California medical use marijuana license. He used marijuana to treat his asthma – boiling the root of the plant and making it into a tea. Unable to practice his religion or use marijuana to treat his asthma for the past year has also been a collateral consequence to his actions in this case. Despite his history of daily marijuana usage, he abstained from using – in compliance with his conditions of pretrial release – throughout the past year.

The numerous collateral consequences Simon has suffered during the pendency of this case – prior to sustaining a conviction – support our request for a variance.

## VI. The Seriousness of Simon's Actions are Overrepresented by the Sentencing Guidelines

Drug related offenses comprise the majority of Simon's prior convictions. His last conviction for a drug offense was for the possession of marijuana in 2009, more than 15 years ago. In 2013, Simon pled guilty to a misdemeanor sex related offense. While the offense did involve a minor, the factual allegation involved an action by Simon that led to the minor having intercourse with another person, not with him. For his actions in that offense, Simon was convicted of a misdemeanor and required to register as a sex offender at the lowest tier in California – Tier 1. The only prior conviction contributing to his criminal history score stems from a guilty plea for failure to register the license plate number of his car – in compliance with sex offender registry requirements – in 2015. For that offense he was sentenced to 90 days incarceration. It is that misdemeanor conviction that places him in criminal history category two instead of category one. As such, his criminal history score overrepresents the seriousness of his criminal history and supports our request for a variance.

While Simon understands the illegality of his actions in this case, he was shocked to learn the extent of the potential penalty for communicating threats over the phone out of frustration. Simon

now fully understands the potential consequences of the actions he displayed in this case. For the 5-foot 6 inches tall man weighing 125 pounds, who had a loud bark with no bite, there is no need to impose an additional period of incarceration to deter him from expressing his frustration in this manner in the future.

## VII. Conclusion

Simon's current predicament has been overwhelming. The two-month transport to St. Thomas was a test of his wills. From week to week, he did not know where he would end up, what type of facility he would be placed in, and who would be his cellmate. Since his release, he has been unable to leave the house, so he is confronted with the consequences of his actions not just daily, but hourly. He has not been able to see his young daughter in person for over a year. In his words, "the stress of it all could bring someone to tears", but Simon was raised that men don't cry, so he does his best to remain strong. His ability to keep his composure and complete this year and a month on home incarceration with no violations supports our request for a variance. Simon is the perfect candidate for probation or a period of supervised release.

Date: May 16, 2025

Respectfully submitted,

*/s/ Kia D. Sears*

KIA D. SEARS
Assistant Federal Public Defender
1336 Beltjen Rd., Suite 202
St. Thomas, VI 00802
Tel (340)774-4449
Fax (340)776-7683
E-mail: Kia_Sears@fd.org